## Case No. 15,231.

### UNITED STATES v. GORDON.

[5 Blatchf. 18.] [1]

Circuit Court, S. D. New York.   Nov. 8, 1861;
Nov. 30, 1861.

CITIZENSHIP—SHIPPING—AMERICAN VESSEL—SLAVE
TRADE—INDICTMENT—SENTENCE.

1. A person born abroad. on board of an American vessel, of parents who are citizens of the United States, and who are, at the time, in the foreign country. not with the design of removing thither, but only having touched there in the course of a voyage which the father has made, as captain of the vessel. is to be regarded as a citizen of the United States.

2. Where it appears that a vessel was built in the United States and belonged to American citizens, it is not enough. in order to show that she ceased to be an American vessel. to prove that she was taken abroad and there sold and transferred by those American citizens. but it must also be shown that she was sold and transferred to a foreigner.

3. Where a vessel is shown to have been fitted out for the purpose of engaging in the slave trade; her master. if he had control and charge of the vessel. in procuring the cargo, in stowing it and in shipping the seamen. is to be held chargeable; as matter of law, with a knowledge of the intended service of the vessel.

4. If such master conducts the vessel to Africa, remains in her. and starts to come back with her, she having there taken on board a cargo of slaves, such previous knowledge on the part of the master, is, on the trial of an indictment against him for engaging in the slave trade, to be taken into consideration by the jury, on the question as to the purpose for which he was found on the vessel. in Africa, when the slaves were put on board.

5. To sustain an indictment. under the 5th section of the act of May 15. 1820 (3 Stat. 601), for forcibly confining and detaining negroes on board of a vessel. with intent to make them

slaves, it is not necessary to show that physical or manual force was exercised on board of the vessel, but it is enough if the negroes were under moral restraint and fear there, their wills being controlled by superior power exercised over their minds and bodies. it appearing that they were under restraint at the time by the persons who furnished them at the vessel's side and transferred them to the vessel, and that they came upon the deck of the vessel in that condition; and any person who participated in such sort of detention is to be regarded as a principal in the offence.

6. In such an indictment, it is sufficient to aver. that the defendant forcibly confined and detained the negroes. "they not having been held to service by the laws of either of the states or territories of the United States," without otherwise averring that they were not so held to service at the time of the commission of the offence.

7. An offence commenced to be committed on board of an American vessel lying at the time in a river which is an arm of the sea. on the coast of Africa. and continued uninterruptedly to a point in the Atlantic Ocean several miles from land. is within the jurisdiction of the United States and of a circuit court thereof.

8. Although a trial and conviction have been had for a capital offence before a circuit court when held by both of the judges thereof. it is competent for the same court, when held by only one of the judges. to pass the sentence.

This was an indictment against the defendant [Nathaniel Gordon], under the 5th section of the act of May 15, 1820 (3 Stat. 601), for forcibly confining and detaining, on the 8th of August. 1860, on waters within the admiralty and maritime jurisdiction of the United States. and within the jurisdiction of this court. and out of the limits of any state or district. on board of the ship Erie, owned wholly or in part. or navigated for, or in behalf of. a citizen or citizens of the United States. certain negroes, not having been held to service by the laws of either of the states or territories of the United States. with intent to make such negroes slaves, he being, at the time of the commission of the crime, one of the ship's company of the ship, and a citizen of the United States, and the Southern district of New York being the district in which he was apprehended and into which he was first brought. The trial took place before NELSON, Circuit Justice, and SHIPMAN, District Judge, and a jury.

E. Delafield Smith. Dist. Atty., for the United States.

Gilbert Dean, for defendant.

NELSON, Circuit Justice (charging jury). The 5th section of the act of May 15. 1820. under which the prisoner is indicted. provides, "that if any citizen of the United States. being of the crew or ship's company of any foreign ship or vessel engaged in the slave trade. or any person whatever. being of the crew or ship's company of any ship or vessel. owned wholly or in part, or navigated for, or in behalf of. any citizen or citizens of the United States, shall forcibly confine or detain, or aid and abet in forcibly confining or detaining, on board such ship or vessel. any negro or mulatto not held to service by the laws

[1] [Reported by Hon. Samuel Blatchford, District Judge. and here reprinted by permission.]

of either of the states or territories of the United States," with intent to make him a slave, such person shall be adjudged a pirate, and, on conviction, shall suffer death. There are two counts in the indictment, to which we shall call your attention, and to which the observations that we shall make on the law of the case will be confined. The first count is, in substance, that the prisoner, one of the ship's company of the ship Erie, owned in whole or in part by American citizens, in the river Congo, did piratically, feloniously, and forcibly confine and detain eight hundred negroes on board, with intent to make them slaves. The third count is, that the prisoner, a citizen of the United States, one of the ship's company of the ship Erie, a foreign vessel, engaged in the slave trade, in the river Congo, did piratically and forcibly confine and detain eight hundred negroes on board such vessel, with intent to make them slaves. Under the statute which we have read to you, in order to make out the offence against the prisoner, it is necessary, on the part of the government, to prove, either that he is a citizen of the United States, or that the vessel on which he served, with which he was engaged in the slave trade, belonged, in whole or in part, to citizens of the United States. If the prisoner is a citizen of the United States, then the crime charged against him, of forcibly detaining these negroes, may be made out, if he was on board of a foreign vessel. But, if he was not a citizen of the United States, but a foreigner, then, in order to charge him with the crime, it must appear that it was committed upon an American vessel, or at least a vessel owned, in whole or in part, by citizens of the United States. Two questions, therefore, become material: First—Was the prisoner at the bar a citizen? Now, proof is given by two witnesses, that they knew both his father and his mother in Portland, Maine, before their marriage. They were both residents of that place. The witnesses also knew them after their marriage, in the same place, and knew the prisoner, the fruit of that marriage, when two or three years old. The question is, upon this testimony—Was the prisoner a native-born citizen, born in Portland or in the United States? It has been argued, by the counsel for the prisoner, that there is some evidence that the mother, after the marriage, was in the habit of going with her husband, who was a sea captain, upon foreign voyages; and it is insisted that, upon this state of facts, the prisoner may have been born abroad. Perhaps, the presumption being, upon the evidence, that he was born in Portland, a prima facie case being made out that he was born there, the burden would rest upon him, to show that he was born abroad. But we take it to be settled law, that, although he was born in a foreign country, yet if his father and mother were American citizens, and did not have the design of removing to the foreign country, but touched there in the course of a voyage which the father made as a sea cap-

tain, the child would still be regarded as an American citizen.

Next, gentlemen, as to the character of the vessel. Was she an American vessel, or owned, in whole or in part, by American citizens? It appears that she was built in the United States, and belonged to American citizens, and made a voyage from England to Havana; and, it is insisted that, after her arrival at Havana, she was sold and transferred by those American citizens. We have the account from Mr. Post, who owned three-fourths of her at the time of the sale. He states, that though he was not present at the time of the sale, yet one of the other part owners, Mr. Knudsen, was with the vessel as its master, and that he received from Havana, in March, 1860, the proceeds of the sale, and had no doubt that she had been sold and transferred. Perhaps, on this evidence, it would be difficult to deny that a sale and transfer was made of this vessel out of those American owners, so far at least as Mr. Post is concerned; and he says, also, that he accounted with the other part owners for their share of the price. The difficulty, in this part of the case, is, that it is not enough to show that the title to this vessel was conveyed by these American owners in March, 1860. That is not sufficient, because, before any change can be made in the character of a vessel, after it has been proved that she belonged to American owners, it must appear that the transfer was made to a foreigner. To whom this vessel was transferred, we have no evidence in the case. But, as I before said to you, gentlemen, it is not necessary, upon this branch of the case, that the prisoner should be a citizen, and, also, that the vessel should be an American vessel. It is sufficient, if either of these facts exists, for the commission of the crime charged in the indictment.

This brings us, gentlemen, to the merits of the case, and the question is, is the prisoner guilty or not, of forcibly confining or detaining the negroes on board of this vessel, in the Congo river, with the intent of making them slaves? This is the issue in the case, so far as the real merits are involved. Now, you have the evidence, on the part of the government, of Martin, Green, Alexander, and Hetelberg, four seamen on board of the Erie, who shipped in Havana, in April, 1860, a short time after this alleged sale and transfer. They have detailed to you the circumstances of their employment as seamen, the cargo with which the vessel was laden at that port—some 150 or more hogsheads of liquor, a number of barrels of pork and beef, bags of beans, barrels of bread and rice, and some 250 bundles of shooks, with a corresponding number of hoops, for the purpose of being subsequently manufactured into barrels or casks. Now, it may be material for you to inquire, in entering upon the consideration of this issue, whether this was a bona fide cargo, for lawful trade and commerce, or whether it was a cargo fitted out and in-

tended to be used in the slave trade. The vessel was of some 500 tons. If this was a fitting out for the purpose of engaging in the slave trade, and the prisoner at the bar had a knowledge of this intended service of the vessel, then that fact would accompany him to the Congo river, and will have its weight and its influence upon your minds, as to the connection that he had with the transaction that occurred there, in receiving these negroes on board and detaining them. It may undoubtedly be assumed, without any injustice, as a matter of law, the prisoner being the master of the vessel at the port of Havana, and for her voyage to the Congo river, that if this cargo was fitted out for that purpose, if it was a cargo not only proper for that purpose, but intended for that purpose, he, as master, who had the control and charge of the vessel in procuring the cargo, in stowing it, and in shipping the seamen, is chargeable with a knowledge of these facts. Now, these four witnesses, whom you have seen on the stand, have detailed the progress of the voyage from Havana to the Congo river, and the taking of these negroes on board, and the starting from the river on the return voyage to Havana. Their testimony has been so frequently referred to by counsel, and commented upon by them, that I shall not take up your time in going over it. The four concur in the account which they have given of the voyage. They state that, after they had been out some thirty days, and had discovered the provisions and freight on board, a suspicion arose, in the minds of the sailors, that the vessel might be intended for the slave trade, and that they disclosed this suspicion to the captain, assigning to him the reason and grounds of it. The captain, however, disclaimed any such purpose, rebuked the suspicion, and ordered them forward. They all concur in stating that, after the vessel arrived in the Congo river, and while the persons connected with her, and those who furnished the cargo of negroes, were engaged in putting the negroes on board, the captain continued in command of her, so far as they saw, and exercised the same control over the vessel, and her management, and the putting on board of these negroes, as he had previously exercised in the course of the voyage. They also state that, after the negroes were put on board, they were called aft, and were applied to for the purpose of ascertaining whether they would continue to serve as seamen on the return voyage, and were told that, if they would, they should be paid a dollar a head for every negro landed at Cuba. They also state, especially some of them, that the prisoner gave a direction for hoisting the anchor, and directed the course of the vessel when she came out of the river. These are the material facts which have been testified to by the witnesses for the prosecution. On the part of the prisoner, you have the testimony of the first and second mates, who, in all these respects, with, perhaps, one exception,

contradict these four witnesses. They state that, after the arrival of the vessel and the discharge of the cargo, the prisoner no longer exercised any control over the management of the vessel, and the control of the vessel and her navigation were passed over to the hands of another person, first, to Mr. Hill, who died, and afterwards to Mr. Manuel, whom they regarded as the captain of the vessel; and that subsequently the prisoner had no management or control of her. One of them, the mate, I think, states that he was present when the seamen were applied to, with the view of ascertaining whether they would serve on the return voyage, and his statement differs from the account given by the seamen in this: He says, that the prisoner applied to the seamen, on behalf of the owners of the vessel, and that, as agent, or on behalf of the owners, holding a letter in his hand at the time, which purported to be an authority, he made this offer to them, for the purpose of engaging them. This is the only discrepancy, so far as regards that fact testified to by the seamen.

Now, as I before stated to you, if the prisoner at the bar, as master of this vessel, at Havana, had a knowledge that she was fitted out, equipped, and provisioned for a voyage to the Congo river, on the coast of Africa, for the purpose of engaging in the slave trade, then, in view of the fact of his entering upon that voyage, conducting the vessel to a foreign coast, remaining in her, and coming back with her, or starting to come back with her, before she was captured, this previous knowledge of the prisoner, and his engagement to navigate the vessel for that purpose, will have its influence as to the purpose for which he was found upon the vessel in the Congo river, at the time the negroes were put on board; and it is entitled to whatever weight you may think it deserves, in aiding or supporting the testimony of the four seamen, and will raise the question, for your consideration and decision, whether or not the transfer was a part of the original plan of carrying out this engagement of the vessel in the slave trade, and, if such, colorable and not bona fide. This, however, is a question for your consideration and determination.

Now, we have said that, in order to sustain the charge against the prisoner, it must appear that these negroes were "forcibly" confined and detained on board of that vessel, for the purpose of making them slaves—for the purpose of bringing them to Cuba, or elsewhere, to make them slaves. This word "forcibly," which is a material element in the crime charged, does not mean physical or manual force. Even the crime of robbery, in which force is a peculiar element of the crime, it being the taking violently the property of another from his person, need not be accompanied with or consist of actual force. Any conduct, on the part of the robber, putting the person deprived of his goods in bodily fear and terror, is equivalent to ac-

tual force. And so in this case. These negroes were collected at the place where they were put on board, in barracoons, and were there under restraint by the persons who furnished them at the ship's side. They were in bondage at the time, and under the control of those persons, who transferred them to the vessel. They came upon the deck of the vessel in that condition, and it would be strange, indeed, if it was made necessary by the law, that it should be shown that they made personal, physical resistance at the time, against being put on board and detained on board, under all these circumstances. It is sufficient that they were under moral restraint and fear—their wills controlled by this superior power exercised over their minds and bodies; and any person participating in that forcible detention, that sort of detention, is a principal, participating in the guilt of the offence.

Then, as to the intent of making them slaves. This, undoubtedly, is a question of fact for the jury. You must find it, but you can find it as an inference from the surrounding circumstances attending their being put on board and forcibly detained on board. If any other purpose, any lawful purpose, had been shown to you by the evidence in the case, undoubtedly it would have been pertinent and satisfactory for the purpose of rebutting such a presumption of intent. But, in the absence of any such evidence, it is for you to say whether the inference is warranted by the testimony.

These are all the observations that we deem it advisable to submit to you, but we will call back your minds to the material question, so that you may look into the case with intelligence and comprehend the real issue involved in the case, which is—Were these negroes, that were put on board of the Erie, in the Congo river, in August, 1860, forcibly detained or confined, with the intention of making them slaves, and did the prisoner, on board of that vessel, at the time, participate in that confinement and detention? If he did, he is guilty of this offence, under the statute. If he did not, he is innocent.

The jury found the defendant guilty. He subsequently made, before NELSON, Circuit Justice, and SHIPMAN, District Judge, a motion for an arrest of judgment and a motion for a new trial.

SHIPMAN, District Judge. We have carefully considered the point submitted to us, on the motions for an arrest of judgment and for a new trial, and the arguments of counsel thereon. In disposing of these motions, we do not deem it important to discuss any exceptions taken to the form of the indictment, except such as apply to the first and third counts, inasmuch as it was upon those two counts that we put the case to the jury. If either one of those counts is good, the indictment is sufficient to support the verdict.

The only objection taken to the form of the first and third counts is, that they do not aver, in the precise words of the statute, the condition of the negroes, as "not held to service by the laws of either of the states or territories of the United States," at the time of the commission of the offence, the language of the indictment being, "not having been held to service, &c." It is argued that, if the defendant had been able to prove that they had been once held to service, at some time prior to the commission of the offence, this averment would have been negatived, and he would have been entitled to an acquittal. But this, we think, only proves that the language of the indictment, in this particular, is more comprehensive than was necessary. The indictment charges him with having forcibly confined and detained the negroes, they not having been held to service, &c., that is, not having been held to service at the time he so confined and detained them, or at any time previous. The fact that the terms of the averment are somewhat broader than those of the statute is not material, so long as they cover the offence described in the latter.

To the objection that there was no such proof that the vessel upon which the offence was committed, was "owned wholly, or in part, or navigated for, or in behalf of, any citizen or citizens of the United States," as would warrant a conviction on the first count, we cannot accede. The government proved that she was built in, and owned by citizens of, the United States. This fixed the national character of the vessel, and this character and ownership would be presumed to continue until they were shown to have been changed. To show such a change, the burden of proof was on the defendant. The evidence offered only tended to show that a sale was made of the vessel at Havana, but without showing to whom such sale was made. It is urged, by the defendant's counsel, that, inasmuch as the sale claimed to have been proved was made in a foreign country, the law will presume, until the contrary is shown, that it was made to foreigners. We think there is no foundation, in law or reason, upon which such a presumption can rest.

In support of that part of the indictment which charges that the defendant was an American citizen at the time of committing the offence, the government proved that his father and mother were residents of Portland, in the state of Maine, for many years, both before and after their marriage, and before the birth of the defendant, and while he was a small child. It also appeared, from the testimony of the same witnesses, that his father was a sea captain, and that sometimes his wife, the defendant's mother, accompanied him on his foreign voyages. The defendant's counsel claimed, that it appeared, from this evidence, that he might have been born abroad, and that, if he was, he was not a citizen of the United States, and, therefore,

not amenable to those criminal laws of the United States which are limited in terms to its citizens. The court instructed the jury, however, that, even if the defendant was born during one of those voyages which the father made as a sea captain, without any intention of removing to, but merely touching at, foreign countries, he would still be regarded in law as an American citizen, although thus born abroad, provided his parents were American citizens. The defendant's counsel excepted to this part of the charge, on the ground that it did not lay down the correct rule of law applicable to children of American parents, born in foreign countries. Without here discussing the general principles of law applicable to that subject, it is a sufficient answer to the exception taken in this case, that the charge on this point, taken in connection with the facts in evidence to w:ich it was to be applied, clearly referred to a possible birth of the defendant on boa-d of his father's American vessel, while the latter was in a foreign country, in the course of the voyage. We are clearly of opinion, that there was no error in this part of the charge.

The only remaining objection that we deem it necessary to notice, is, that, if the Erie was a foreign vessel, even admitting the citizenship of Gordon. this court has not the jurisdiction to try him for an act committed on the river Congo, in the Portuguese dominions, and not on tide waters. There are two answers to this objection: First. There is no proof that the Erie was a foreign vessel, but the proof is clear and uncontradicted that she was an American vessel, owned by American citizens. Second. The allegation, in the indictment, that the offence was committed "in the river Congo, on the coast of Africa, on waters within the admiralty and maritime jurisdiction of the United States, and within the jurisdiction of this court." is, we think, fully sustained by the proof. The proof is, that the negroes were taken on board in the Congo river, some distance from its mouth, but where it is several miles broad, and really an arm of the sea. The proof is clear and uncontradicted, that the offence of confining and detaining the negroes on board was continuous and uninterrupted, until her capture in the Atlantic Ocean, several miles from land. Of course, it was committed in the very mouth of the river, where its broad expanse is lost in the Atlantic, and where the jurisdiction of every nation, over its citizens or its ships, clearly extends. The other exceptions to these two counts and to the charge, are overruled.

Upon all these points, we are clearly of opinion, that there is no error in the indictment, and that none intervened on the trial, and that the jurisdiction of the court is beyond dispute. We are. therefore, constrained to deny the application for a certificate of division, which is asked for by the defendant, to enable him to carry the case to'

the supreme court. It is hardly necessary for me to add that these views are the result of consultation. and are fully concurred in by Mr. Justice NELSON.·

Sentence of death being about to be passed on the defendant by Judge SHIPMAN, holding the court alone, in the absence of Mr. Justice NELSON, it was objected by the counsel for the defendant, that this could not be done. because the trial had taken place before both of the judges. Judge SHIPMAN stated, that he and Mr. Justice NELSON had agreed, on consultation, that it was competent for the court, when held by only one of the judges, to pass the sentence.